**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROADCAST MUSIC, INC.,<br><br>Petitioner,<br><br>v.<br><br>RADIO MUSIC LICENSE COMMITTEE, INC.,[1]<br><br>Respondent. | 17 Civ. ______ (LLS)<br><br>Related to *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (LLS) |

**PETITION OF BROADCAST MUSIC, INC. FOR THE DETERMINATION OF REASONABLE INTERIM LICENSE FEES**

Pursuant to Section XIV(B) of its Consent Decree,[2] Broadcast Music, Inc. ("BMI") hereby submits this Petition[3] seeking a determination of reasonable interim license fees for all BMI-affiliated musical compositions performed publicly by the thousands of commercial radio broadcast stations represented by the Radio Music License Committee (the "RMLC Stations"). In support thereof, BMI respectfully submits as follows:

**Introductory Statement**

1. BMI's licensing relationship with the RMLC and the radio industry is longstanding. The most recent final blanket and per program licenses expired as of December

[1] BMI has named the Radio Music Licensee Committee, Inc. (the "RMLC") as Respondent in this Proceeding solely in its capacity as representative of the FCC-licensed broadcast radio stations operating in the United States represented by the RMLC, effective as of January 1, 2017. A list of those stations can be found in Exhibit 1 attached hereto.

[2] "Consent Decree" refers to the Final Judgment entered in *United States v. Broad. Music, Inc.*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), as amended by 1996-1 Trade Cas. ¶ 71,378 (S.D.N.Y. 1994). A copy of the Consent Decree is attached hereto as Exhibit 2.

[3] Pursuant to the Order of Judge Louis L. Stanton, dated April 25, 2001, in *United States v. Broadcast Music, Inc.*, 64 Civ. 3787, BMI brings this proceeding by separate petition and notes that this proceeding is related to 64 Civ. 3787.

31, 2016. Despite negotiations during 2016, the parties have yet to reach an agreement on interim or final fees to commence on January 1, 2017.

2. BMI requests that the Court extend the terms of the previous final agreement between BMI and RMLC Stations, which included a rate of 1.7% of each licensee's gross revenue and a corresponding reduced rate applicable to talk format stations that have elected the Per Program License,[4] on an interim basis pending an agreement on, or determination of, final license fees for the RMLC Stations. As explained in detail below, BMI's interim rate proposal is reasonable. Indeed, BMI believes that the market developments will support a *final* rate of greater than 1.7% of gross revenue payable to BMI.

3. The interim rate proposed by the RMLC represents a drastic reduction in the rate payable to BMI based on the parties' previous final agreement—from 1.7% of gross revenue to 1.4% of gross revenue—and is unreasonable. The RMLC can point to no changed circumstances that warrant a reduction in BMI's interim or final rate. Indeed, since entering into the last license, RMLC Station music use, particularly via new media, has exploded, warranting an increase, not decrease in rates. Moreover, the RMLC's interim rate proposal is inconsistent with the RMLC's recently announced final license agreement with the American Society of Composers, Authors & Publishers ("ASCAP"), which increased the rates payable to ASCAP as of January 1, 2017.

4. BMI therefore brings this Petition, pursuant to Section XIV(B) of the Consent Decree, to ensure that its affiliated songwriters, composers, and music publishers are appropriately compensated for RMLC Stations' use of their musical works during this interim

---

[4] Under the recently expired license, stations with limited music use (*i.e.* talk radio format stations) could elect a Per Program License with a base fee of 0.2958% of gross revenue plus a supplemental fee calculated based on the number of weighted program periods containing at least one feature performance of music in the BMI repertoire.

period while BMI and the RMLC negotiate a binding final license agreement, or a final license fee is set by the Court.[5]

**The Parties**

5. Founded in 1939, BMI is a music performing rights licensing organization ("PRO") that operates on a non-profit making basis. BMI obtains the non-exclusive right to license the public performing right in musical compositions from songwriters, composers, and music publishers (collectively, BMI's "Affiliates"). BMI's repertoire presently consists of the public performing right in approximately 12 million musical works from the catalogs of approximately 750,000 Affiliates and covers the entire range of musical genres.

6. BMI issues performing right licenses to music users, collects license fees from them, tracks musical performances, and distributes royalties to its Affiliates. BMI licenses a broad range of music users across a wide array of industries including, *inter alia*, approximately 10,000 commercial radio stations, hundreds of broadcast and cable television networks, thousands of internet digital services and websites, concert halls, concert promoters, universities, and hundreds of thousands of restaurants, nightclubs, retail stores, and hotels.

7. Through BMI, licensees obtain public performance rights in any and all of the works in BMI's repertoire. In this way, BMI increases the availability of music to users, reduces transaction costs, and ensures that songwriters, composers and music publishers are fairly compensated for the performance of their works.

8. The RMLC is a non-profit organization that negotiates licenses on behalf of approximately 7,000 of the 10,000 total domestic commercial broadcast radio stations. In addition, owners of the approximately 3,000 commercial radio stations who are not part of the

[5] The interim fee set by the Court pursuant to Section XIV(B) will be subject to retroactive adjustment once a final fee is determined.

RMLC have agreed with BMI to be bound by the outcome of negotiations or rate court proceedings between BMI and the RMLC concerning interim and final license fees.

**Jurisdiction**

9. BMI commences this proceeding pursuant to Section XIV(B) of the Consent Decree, which provides that "[w]hen an applicant has the right to perform any compositions in [BMI's] repertory pending the completion of any negotiations or proceedings provided for in Subsection (A) hereof, either the applicant or [BMI] may apply to this Court to fix an interim fee pending final determination of what constitutes a reasonable fee."

10. Jurisdiction is therefore proper in this Court, pursuant to this Court's rate-setting authority under Section XIV(B) of the Consent Decree, because: (i) the RMLC made a written application for a license pursuant to Section XIV(A) of the Consent Decree on December 22, 2016; and (ii) BMI and the RMLC have not completed their negotiation of final license fees and terms. Accordingly, BMI seeks this Court's determination of a reasonable interim license fee with respect to the RMLC, under Section XIV of the Consent Decree.[6]

11. Venue is proper in this District as a result of the express consent of the RMLC in applying for a license pursuant to the Consent Decree.

**History of Negotiations Between BMI and the RMLC**

12. In August 2012, this Court approved an industry-wide settlement between BMI and the RMLC covering the seven-year license period January 1, 2010 through December 31, 2016 (the "BMI 2010 License"). The BMI 2010 License provides for a blanket license rate of 1.7% of each licensee's gross revenue for all broadcast and new media offerings.

[6] As a result of the parties' failed interim fee negotiations, BMI will be forced to delay payment to its Affiliates for performances of their works by RMLC Stations beginning as of the first quarter of 2017.

13. In March 2016, BMI and the RMLC began negotiating the fees and terms of a new agreement covering the period from January 1, 2017 forward. In July 2016, BMI sent the RMLC proposed terms for a final fee agreement. BMI received no response to its proposal from the RMLC for over five months. To date, the parties have failed to reach an agreement.

14. In November 2016, after reviewing its proposed license extension agreement with the RMLC, BMI sent the approximately 3,000 commercial radio stations not represented by the RMLC license extension agreements, extending the terms of the BMI 2010 License with an interim rate of 1.7% of each licensee's gross revenue, along with an explanation of the options available to those stations for the period beginning January 1, 2017. Over 1,100 stations have already signed the license extension agreements, and are currently paying BMI at the same final rate on an interim basis as of January 1, 2017. Although the license extension agreements provide for the adjustment of interim fees payable based on the outcome of negotiations with the RMLC or the Court's interim fee order, they demonstrate that a significant number of stations believe it is reasonable to continue paying BMI at an interim rate of 1.7% of gross revenue.

15. On December 22, 2016, the RMLC requested a license from BMI, pursuant to Section XIV(A) of the Consent Decree, to cover specified public performances by RMLC Stations of BMI-affiliated musical works for the period January 1, 2017 through December 31, 2021. *See* Exhibit 1 attached hereto.

16. In its December 22, 2016 letter, the RMLC first raised the issue of a reduced interim license fee, and proposed paying BMI a rate of 1.4% of gross revenue on an interim basis, rather than continuing to pay the prevailing rate of 1.7% of gross revenue under the BMI 2010 License. The RMLC's proposed rate of 1.4% would also extend to commercial radio

stations' digital offerings, although the scope of those offerings has greatly expanded over the course of the BMI 2010 License term. The RMLC claimed this reduction is appropriate "in light of the RMLC's understanding of BMI's market share of public performances on radio relative to ASCAP and the new costs associated with the emergence of Global Music Rights." *Id.* at 1-2. The RMLC has not disclosed the support for its assertions which, as discussed below, are inconsistent with BMI's internal analyses, the RMLC's recent final license with ASCAP, and the interim rates the RMLC Stations are paying to SESAC Holdings ("SESAC") and Global Music Rights, LLC ("GMR"), the two unregulated domestic PROs.

**The Rate of 1.7% of Gross Revenues Paid by RMLC Stations Under the BMI 2010 License is a Reasonable Interim Rate**

17. It is reasonable to maintain, as an interim rate, the same rate paid to BMI under the BMI 2010 License until such time as the parties negotiate a binding final license agreement, or the Court makes a final fee determination. There has been no significant change in circumstance in the radio industry that would warrant a reduction in fees, and overall music use by radio stations, including of music in the BMI repertoire, has increased dramatically, and is expected to continue to increase going forward. Accordingly, BMI requests that the Court extend the terms of the BMI 2010 License, including the rate of 1.7% of each licensee's gross revenue, on an interim basis pending an agreement on, or determination of, final license fees for the RMLC Stations.

18. Although a PRO's market share on radio tends to fluctuate over time due to the variation in popularity of certain songwriters and songs from year to year, BMI's internal analyses of the most recent performance data from 2016 show that BMI has a significantly greater market share than any other domestic PRO, including ASCAP. Despite this, and despite

recently agreeing to *increase* ASCAP's rate on a final basis, the RMLC seeks to lower BMI's rate. The RMLC's proposed interim rate is unreasonable.

19. The RMLC's proposed reduction in the rate payable to BMI is ostensibly based on the RMLC's new agreement with ASCAP, which was announced publicly on December 15, 2016 and covers the five-year period 2017 to 2021. *See* "ASCAP and the Radio Music License Committee Announce New Agreement," dated Dec. 15, 2016, available at http://www.radiomlc.org/pages/4795848.php. RMLC Stations previously paid ASCAP the same rate of 1.7% of gross revenue and corresponding Per Program License rate called for in the BMI 2010 License. As of the date of this Petition, the rates and terms of the new agreement have not been disclosed publicly by either ASCAP or the RMLC. However, the parties have publicly stated that their new agreement provides for "***increases*** in the rates paid by radio stations to perform music by ASCAP." *Id.*

20. The RMLC contends that ASCAP's increased percentage-of-revenue rate is reflective of an increase in ASCAP's percentage share of radio performances as compared to BMI's. However, BMI's own analyses indicate precisely the opposite: BMI had significantly more performances on radio than ASCAP in 2016, the most relevant year to consider given that the license at issue is effective January 1, 2017. Indeed, the RMLC reached its agreement with ASCAP without reliable information regarding BMI's market share. In view of the recent increase in ASCAP's rate, BMI's requested interim rate of 1.7% of gross revenue is therefore *more than* reasonable—and the RMLC's requested rate of 1.4% is exceptionally unreasonable.

21. The RMLC also cites the emergence of a new unregulated PRO, GMR, as support for a decreased interim license rate for BMI. *See* Exhibit 1 at 2. GMR was founded in 2013 to represent a select group of rights holders who felt that the rates paid by the regulated

PROs were below market. GMR has quickly amassed an estimated 20,000 works, including those written or performed by popular artists such as Adele, Aerosmith, the Beatles, Bruno Mars, Jay-Z, Madonna, Pharrell Williams, and U2. Although both BMI and ASCAP have lost affiliates or members to GMR as of January 1, 2017,[7] by the RMLC's own admission, those losses disproportionately impact ASCAP. *See* Compl., *Radio Music License Committee, Inc. v. Global Music Rights, LLC*, 16 Civ. 6076 (E.D.P.A. Nov. 18, 2016) ("Before joining GMR, all or virtually all of GMR's affiliates were members of ASCAP or BMI. In fact, the vast majority were affiliates of . . . ASCAP.").[8] Upon information and belief, ASCAP has lost five times as many affiliates to GMR as BMI. However, as discussed above, the RMLC and ASCAP have agreed to *increase* the rate payable to ASCAP by RMLC Stations. Having agreed to pay ASCAP a higher rate, despite the disproportionately large number of ASCAP members who have moved to GMR, the RMLC cannot use the emergence of GMR as a basis to reduce fees payable to BMI.

22. Finally, the rates paid by the RMLC Stations to the unregulated PROs, SESAC and GMR, also support an increase in the rate paid to BMI. BMI believes that the RMLC Stations are currently paying SESAC, and will likely pay GMR, interim rates that indicate BMI should be paid at a rate higher than 1.7% of gross revenue. Moreover, BMI expects that the final benchmark agreements between RMLC Stations and GMR will support an increase in final rates to BMI. Upon information and belief, the free market deals currently in

---

[7] GMR has emphasized January 1, 2017 as the deadline for obtaining a license because, as of that date, the stations' "licenses in effect" with ASCAP and BMI will cease to cover songs that have moved to the GMR's repertory during the term of the ASCAP and BMI licenses.

[8] The RMLC has filed an antitrust complaint against GMR, which is currently pending in the Eastern District of Pennsylvania. *See Radio Music License Committee, Inc. v. Global Music Rights, LLC*, 16 Civ. 7076 (E.D.P.A.). GMR has also filed an antitrust complaint against the RMLC, which is currently pending in the Central District of California, alleging that the RMLC Stations act in concert in violation of the Sherman Act to artificially suppress the music license fees paid. *See Global Music Rights, LLC v. Radio Music License Committee, Inc.*, 16 Civ. 9051 (C.D.Cal.).

place between GMR and some of the largest RMLC Station groups, such as iHeart Radio and Townsquare, compel this conclusion. BMI also expects the benchmark license agreement that will result from the binding arbitration currently underway between SESAC and the RMLC, to support an increase in final rates to BMI.

23. BMI's proposed extension of the terms of the BMI 2010 License, including the rate of 1.7% of each licensee's gross revenue, on an interim basis, is reasonable.[9] It would be unreasonable to reduce the interim rate payable to BMI based on conclusory assertions by the RMLC about market share that are necessarily based on inaccurate information about BMI's market share and are contrary to BMI's internal analyses. It would also be unreasonable to reduce the interim rate payable to BMI when other market benchmark rates, including the final rate being paid to ASCAP and, upon information and belief, the interim rates being paid to SESAC and GMR indicate significantly higher rates for BMI. To the extent the RMLC's overall music license fees have increased as a result of those free market negotiations, it does not compel a reduction in fees paid to BMI. On the contrary, an increase in rates would reflect the free market value of music on commercial radio. Such an increase would be wholly consistent with market developments since the last license negotiation, including the growth of new media and the concurrent explosive increase in performances of music by RMLC Stations, and the reduced promotional value that radio stations provide to BMI Affiliates. For those reasons, BMI's proposal to maintain the *status quo*, and continue the current prevailing rate on an interim basis while a final agreement is negotiated or litigated, is reasonable.

---

[9] Although BMI asks the Court to set an interim rate equal to the BMI 2010 License rate, BMI intends to demonstrate the reasonableness of a higher rate during any final rate proceeding before the Court.

**Relief Requested**

WHEREFORE, BMI respectfully requests that the Court enter an Order:

A. Setting interim license fees at a rate of 1.7% of gross revenue for public performances of BMI music by the RMLC Stations, and a corresponding rate as set forth in paragraph 4(D) of the BMI 2010 License, for stations that elect a Per Program License, pending final negotiation or judicial determination of reasonable license fees, and directing those RMLC Stations to pay such license fees, effective as of January 1, 2017, and continuing until a final license fee is set; and

B. For such other and further relief as the Court deems just and proper.

Dated: January 3, 2017
New York, New York

MILBANK, TWEED, HADLEY & MCCLOY LLP

/s/ Atara Miller

Scott A. Edelman
Atara Miller
Eric I. Weiss
Alison Bonelli
28 Liberty Street
New York, New York 10005-1413
Telephone: 212-530-5000
Facsimile: 212-530-5219
Email: sedelman@milbank.com

-and-

Stuart Rosen
7 World Trade Center
250 Greenwich Street
New York, New York 10007

*Attorneys for Petitioner Broadcast Music, Inc.*